GERI LYNN GREEN (SBN 127709)
Law Offices of Geri Lynn Green LC
155 Montgomery Street Suite 901
San Francisco CA 94104
Tel.   415.982.2600
Fax.  415. 358-4562
greenlaw700@gmail.com
gerilynngreen@gmail.com

Attorney for Defendant MANUEL FRANCO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES of AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>IVAN CERNA, et al. (Manuel Franco ),<br><br>Defendant. | Case No. 08-0730-WHA<br><br>**NOTICE OF MOTION AND AMENDED MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENTAL MISCONDUCT AND GOVERNMENTAL MISCONDUCT BEFORE THE GRAND JURY**<br><br>**Date: February 14, 2011**<br>**Time: 8:00 am**<br>**Dept:  Hon, William Alsup** |

TO THE ABOVE ENTITLED COURT AND TO THE UNITED STATES ATTORNEY OF THE NORTHERN DISTRICT OF CALIFORNIA:

PLEASE TAKE NOTICE that on the above date in the above courtroom of the above-entitled court, the defendant, MANUEL FRANCO, will move and does hereby move through counsel the Court for a dismissal based on outrageous governmental misconduct in its conduct during the investigation and for dismissal of the indictment for constitutional error that interfered with the grand jury's independence and the integrity of the grand jury proceeding.

This motion is based on this notice, the attached points and authorities, any and all attached exhibits, the records and files in this action, oral and documentary evidence that may be presented at the hearing on this motion.

1

2

**STATEMENT OF FACTS**

3

4       The following facts are assumed to be undisputed by the government as they are derived

5  from the Government's discovery produced in the instant case. On September 30, 2005, Mr.

6  Franco, with an expressed desire for a career in law enforcement, participated in a 2 hour

7  debriefing with FBI Special Agent Sandra C. Jacquez-Flores, ICE Special Agent Chris

8  Merendino and SFPD Officer Mario Molina.  During that debriefing, in addition to providing

9  extensive information on MS-13, including members' names and addresses, identifying members

10 who have guns, describing MS-13 activities, times and places of meetings, interaction with

11 members from Los Angeles and El Salvador, past criminal activity and planned criminal activity,

12 including murders, gun buys, he also provided information that Sgt. Molina had been green-

13 lighted for murder by the 20th Street Clique of the Mara Salvatrucha gang (MS-13).  (Exhibit H

14 – FBI 302's from September 30, 2005 Supplemental Declaration of Geri Lynn Green filed under

15 seal).

16      His information was found to be reliable and he was put to work by Molina to help set up

17 arrests of gang members and provide intelligence. Mr. Franco, just twenty years old with no

18 criminal record, went to work for Molina on September 30, 2005 as a confidential informant for

19 the SFPD.  He worked exclusively for Molina in that capacity until being recruited by the FBI to

20 work as a paid embedded human source infiltrating the MS-13 in or around February of 2006.

21 Notwithstanding his new position with the FBI, he continued to provide Molina with reliable

22 information about the gang and its activities for the next few years.  (See Molina's Testimony

23 11/5/10 - Exhibit A to Declaration of Geri Lynn Green filed under seal)

24      Over his years of service to the FBI, Mr. Franco worked with some twenty FBI agents

25 before being formally deactivated in a letter dated February 05, 2010, which stated that he "was

26 very reliable, followed directions well, and has provided significant intelligence regarding

27 criminal activity. Furthermore, captioned CHS has provided singular direct information which

28 led to the arrest of a murder suspect and the seizure of a murder weapon." (See OIA

Authorizations - Exhibit B to Declaration of Geri Lynn Green filed under seal)

      At the time Franco became an embedded human source in MS-13, the FBI believed the

MS-13 gang to be a murderous, violent and dangerous gang. The FBI further was aware of the act that the gang members already suspected Mr. FRANCO of being a police informant and therefore had targeted him for murder. (Reports regarding threats - Exhibit C to Declaration of Geri Lynn Green filed under seal)

Individual members of the FBI, with the U.S. Attorney's Office for the Northern District of California regularly renewed Mr. FRANCO's authorization to engage in otherwise illegal activities in the pursuit of infiltrating the MS-13. (Renewals of OIA - Exhibit D to Declaration of Geri Lynn Green filed under seal)

Authorization to engage in otherwise criminal activity requires the FBI agent to closely monitor the human source to ensure the CHS is not exceeding his authority. Authorization must be obtained every 90 days pursuant to the FBI's own Rules. Whenever the FBI agent has reason to believe that the CHS has failed to comply with the terms of authorization, which of course includes engaging in unauthorized conduct, the agent must immediately revoke the CHS's authorization. (Exhibit I – Attorney General Guidelines Supplemental Declaration of Geri Lynn Green filed under seal) That never happened in this case notwithstanding the fact that the Defendant debriefed SFPD, FBI and/or ICE agents on more than 72 occasions. In so doing, he provided intelligence on the inner working of the gang and its members, identified hundreds of gang members, wore body wires to record meetings under extremely dangerous conditions on at least 14 different occasions, and made scores of consensually monitored calls to gang members in efforts to purchase weapons as well as to implicate gang members in the ongoing criminal activity. In furtherance of his handler's goals, Mr. Franco suffered beatings, arrests and threats of murder from the gang. He moved in and lived with Moris Flores, one of the alleged gang leaders where he had better access to information and intelligence, thereby putting himself at even greater risk.

Overt Act 36 charges Mr. Franco with activities that occurred on April 08, 2006. Government discovery makes clear that Franco was wearing a wire for the government on April 08, 2006. (Exhibit J - FBI FD-302s from April 08, 2006 and April 11, 2006, Supplemental Declaration of Geri Lynn Green filed under seal)

In an FBI report dated June 26, 2007, (Exhibit B – Declaration of Geri Lynn Green filed

under seal) FBI Special Agent Flores described Franco as "an established source with excellent access, who has reported reliably for over one year."  Shortly thereafter, Agent Flores stopped by Mr. FRANCO's place of employment and gave him a new cell phone.  Unbeknownst to Mr. Franco, Agent Flores who had been his FBI handler since February 2006 was shortly thereafter transferred to IRAQ on or around October 2007. When Mr. Franco attempted to make contact with her that October, his call went unanswered.  According to FBI records, Flores referred the call to a different agent who made merely token and insincere attempts to respond, calling an out of date phone number, and going to the wrong place of employment.  Thereafter, the new handler, despite his long history of reliable service and after only feeble attempts to contact him abandoned Mr. Franco inside this known dangerous, murderous gang without making any arrangements with regard to his safety with full knowledge that his life was at risk or even making any attempts to inform him of his status.  (Exhibit B - Report dated February 05, 2010, Declaration of Geri Lynn Green filed under seal)

The government, as confirmed by their own gang experts, is well aware of the following: 1) members of MS-13 are required to attack Norteños or perceived Norteños whenever the opportunity arises and failure to do so is considered cowardice that results in loss of standing within the gang and often punitive reprisals; 2) MS-13 in the San Francisco Bay Area used violence and the threat of violence to tax other criminal actors who operate and profit in areas claimed by MS-13 as its territory; 3) Gang members are required to engage in acts of violence by the rules of admission to the gang; 4) Greater respect within the gang is given to members who engage in more numerous and more audacious attacks against rival gang members; 5) It is not only important for an MS-13 member to engage in acts of violence against rivals it is equally important that violence by an MS-13 member be made known to others.  (Exhibits E - Search Warrant Affidavit - to Declaration of Geri Lynn Green filed under seal)

Accordingly, anyone infiltrating the gang as a member would necessarily be forced to engage in or at least be perceived as engaging in acts of violence against Norteños or suffer punishment and possibly death. Hence, Mr. Franco was surrounded by violence and in order to do his job and remain safe, he was required to boast about, and appear to be, engaging in acts of violence.

Throughout the years that he worked as an embedded informant Mr. Franco was under constant threat of being murdered, with his murder being ordered by gang members on numerous occasions. (Exhibit C to Declaration of Geri Lynn Green filed under seal.)  Nonetheless, during his work for the Government, Mr. Franco was responsible for numerous arrests and successful prosecutions.  His intelligence prevented countless acts of violence, shootings and quite possibly murders.  The information provided by Mr. Franco was directly responsible for the seizure of a number of guns from the streets of San Francisco.  His information led to the arrest of at least one murder suspect and the seizure of the murder weapon. (Exhibit B - Letter dated February 05, 2010, Declaration of Geri Lynn Green filed under seal)

## PROCEDURAL HISTORY RELATED TO THE INDICTMENT

The Third Superseding Indictment filed 09/24/2009 charges, Mr. Franco with: **Count One**: Racketeering Conspiracy (18 U.S.C. § 1962(d));§§ **Count Two**: Conspiracy to Commit Murder in Aid of Racketeering (18 U.S.C. §1959(a)(5)§§); **Count Three**: Conspiracy to Commit Assault with a Dangerous Weapon in Aid of Racketeering (18 U.S.C. § 1959(a)(6));§§ **Count Four:** Use Possession of Firearm in Furtherance of Crime of Violence (18 U.S.C. § 924(c) & 2§§).

Of the 119 overt acts alleged in the indictment in Count One, Mr. FRANCO's is alleged to have committed only the following overt acts:

"(21) On or about September 24, 2005, in San Francisco, California IVAN CERNA, a/k/a"Tigre,"  MARVIN CARCAMO, a/k/a "Syco," a/k/a "Cyco," a/k/a "Psycho," ANGEL NOEL GUEVARA, a/k/a "Peloncito," MORIS FLORES, a/k/a "Slow," a/k/a "SlowPain," ERICK LOPEZ, a/k/a "Spooky," DANILO VELASQUEZ, a/k/a "Triste," ARISTIDES CARCAMO, a/k/a "Indio," and MANUEL FRANCO, a/k/a "Dreamer,"  met with other MS-13 members at Mission Playground and discussed, among other things, the leadership of the 20th Street Clique, attacking rival gang members, taking control over drug distribution occurring in territory claimed by MS-, and killing of a rival gang member known as 'Smokey'."

"(22) On or about September 24, 2005, in San Francisco, California MARVIN CARCAMO, a/k/a "Syco," a/k/a "Cyco," a/k/a "Psycho," MORIS FLORES, a/k/a "Slow," a/k/a"Slow-Pain," and MANUEL FRANCO, a/k/a "Dreamer," agreed to conduct surveillance on a rival gang member known as  "Smokey"  whom MS-13 sought to kill."

1

2   "(23) On or about October 21,2005 in San Francisco, California MORISFLORES, a/k/a
    "Slow," a/k/a "Slow-Pain," DANILO VELASQUEZ, a/k/a "Triste," MELVIN
3   MALDONADO, a/k/a "Estrano," a/k/a "Stranger," MANUEL FRANCO, a/k/a
    "Dreamer," and others known and unknown, gathered in the vicinity of 20th Street and
4   San Carlos Street."

5
    "(36) On or about April 8, 2006, in San Francisco, California,  WILBERT CASTILLO,
6   a/k/a "Cypress," MANUEL FRANCO, a/k/a "Dreamer," RODRIGO MOLINA, a/k/a "Lil
    Payaso," a/k/a "Payaso," and others known and unknown, fought with a group of
7   individuals."

8
    "(45) On or about July 18, 2006, in San Francisco, California IVAN CERNA,a/k/a
9   "Tigre," MARVIN CARCAMO, a/k/a "Syco," a/k/a "Cyco," a/k/a "Psycho," ANGEL
    NOEL GUEVARA, a/k/a "Peloncito," ERICK LOPEZ, a/k/a "Spooky," DANILO
10  VELASQUEZ, a/k/a "Triste," ARISTIDES CARCAMO, a/k/a "Indio," MANUEL
    FRANCO, a/k/a "Dreamer," WALTER CHINCHILLA-LINAR, a/k/a "Demonio  and
11  others known and unknown met and discussed the need to attack rival gang members. "

12

13                               ARGUMENT
    I.   OUTRAGEOUS GOVERNMENT CONDUCT VIOLATES THE DUE PROCESS
14       CLAUSE AND REQUIRES DISMISSAL OF AN INDICTMENT.

15       The Supreme Court first recognized that outrageous government conduct may warrant

16  dismissal of an indictment in *United States v. Russell*, 411 U.S. 423 (1973). In *Russell*, the Court

17  stated that there might be situations "in which the conduct of law enforcement officials is so

18  outrageous that due process principles would absolutely bar the Government from invoking

19  judicial process to obtain a conviction."

20       Dismissal of an indictment for outrageous government conduct may also be predicated on

21  a court's inherent supervisory powers. See *United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir.

22  1989) ("The dismissal of an indictment because of outrageous government conduct may be

23  predicated on alternative grounds: a violation of due process or the court's supervisory

24  powers."). The basis for dismissal affects the standard of review on appeal. Courts of Appeal

25  review de novo a denial of a motion to dismiss an indictment on due process grounds. *United*

26  *States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986), cert. denied, 479 U.S. 869 (1986). A

27  denial based on a refusal to exercise the court's supervisory power is reviewed for abuse of

28  discretion. *United States v. Simpson,* 813 F.2d at 1465 n.2, cert. denied, 484 U.S. 898 (1987).

Factual findings upon which the decision was based are reviewed for clear error. *United States v. Emmert*, 829 F.2d 805, 811 (9th Cir. 1987).

Courts recognize that a claim of outrageous government conduct differs from the defense of entrapment. "The issue of entrapment focuses on the intent or predisposition of the defendant to commit the crime. The concept of outrageous government conduct focuses on the Government's actions. An indictment may be set aside because of outrageous government conduct whether or not the defendant was predisposed to engage in criminal activity." Courts dismiss cases when "the nature and extent of police involvement in th[e] crime [is] so overreaching as to bar prosecution of the defendants as a matter of due process of law."

Four factors determine whether the government's conduct is sufficiently outrageous to warrant dismissal: 1) Whether the defendants were active participants in the crime before the government involvement began; 2) Whether the defendants would have been able to commit the crime without the government involvement; 3) Whether the government entered an ongoing criminal enterprise or the criminal enterprise was spurred on by the government's actions; and 4) Whether the misconduct was performed by a government agent or a private informer.

As the Northern District of California noted when granting a motion to dismiss for government misconduct, "[j]ust as a defendant's lack of prior criminal involvement is relevant to an entrapment defense, so too is it relevant to a claim of outrageous government conduct. In neither case is it dispositive, but it is highly relevant to the issue of whether the defendant or the government should ultimately be held accountable for the instigation of the crime." *Batres-Santolino*, 521 F.Supp. at 751 (internal citations and quotations omitted). As the court in *Batres-Santolino* noted, while the lack of prior criminal involvement can demonstrate that the government instigated the crime, the existence of prior criminal involvement does not negate the government's egregious conduct. For example, in *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), the convictions were reversed on outrageous-government-conduct grounds even though the defendants had previously been convicted of precisely the same crime. Mr. Franco had no criminal record prior to his work as an FBI and SFPD embedded informant.

"Almost all of the cases rejecting an outrageous government conduct defense involve

defendants who have previously been involved in similar crimes, and/or a criminal enterprise that was already in progress at the time government agents became involved." Here, as Mario Molina described, the criminality of the organization had subsided prior to 2005. It was that period when the ICE informants 1211 and 1218 took over and revved up the violence. It was also during that period that the FBI embedded Mr. Franco in the organization.

Courts have upheld a charge of outrageous government conduct in circumstances where the defendants lacked the capacity to commit the crimes with which they were charged without the government's assistance. Here, Mr. Franco could not have bought and sold guns without funding from the government. The FBI and SFPD paid him and encouraged him to engage in the conspiratorial activities he finds himself charged with here. Then, without telling him, they simply abandoned this young man in what they have described as the most violent and murderous gang. Then, when he was able to finally come describe the activities he had witnessed during his handler's absence, they charge him with the very activity they had him perform.

Courts have found that excessive involvement by the government is more culpable where—as here—the conduct is performed not by a private informer, but by a government agent who ought to know better. "Passive tolerance . . . of a private informant's questionable conduct [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991), quoting, Simpson I, 813 F.2d at 1468. Here, the actions were performed by numerous FBI government agents, U.S. Attorneys, and SFPD officers.

In *Green v. United States*, 454 F.2d 783 (9th Cir. 1981), the Ninth Circuit concluded "[w]e do not believe the Government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators. . . . When the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative."

Here, the government encouraged a young man's dreams to become a law enforcement

agent while deceiving him into believing if he embedded in the gang he could someday attain his dream.  Then, without ever specifying any unauthorized acts, they charged him with the very conspiratorial acts they encouraged and facilitated.  These charges against Mr. Franco should be dismissed.

II.     **UPON A SHOWING THE GOVERNMENT COMMITTED MATERIALLY PREJUDICIAL MISCONDUCT BEFORE THE GRAND JURY, MR. FLORES WOULD BE ENTITLED TO A DISMISSAL OF THE INDICTMENT.**

A court may dismiss an indictment if it perceives constitutional error that interferes with the grand jury's independence and the integrity of the grand jury proceeding. "Constitutional error is found where the 'structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice to the defendant." *United States v. Larrazolo,* 869 F.2d 1354, 1357-58 (9th Cir. 1989). Constitutional error may also be found "if [the] defendant can show a history of prosecutorial misconduct that is so systematic and pervasive that it  affects the fundamental fairness of the proceeding or if the independence of the grand jury is substantially infringed." *Id.* at 1358.

In addition, a district court may draw on its supervisory powers to dismiss an indictment. The supervisory powers doctrine "is premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." Id. at 1358. Before it may invoke this power, a court must first find that the defendant is actually prejudiced by the misconduct. Absent such prejudice - that is, absent "'grave' doubt that the decision to indict was free from the substantial influence of [the misconduct]" - a dismissal is not warranted. *Bank of Nova Scotia v. United States*, 487 U.S. 250,256 (1988); see also *United States v. Williams*, 504 U.S. 36, 51-53 (1992) (the supervisory power can be used to dismiss an indictment where misconduct before a grand jury "amounts to a violation of one of those 'few, clear  rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions.'"(quoting *United States v. Mechanik,* 475 U.S. 66, 74 (1986)).

The intentional presentation of false testimony to the grand jury is one type of Constitutional error that may warrant dismissal under either the Fifth Amendment or the

supervisory power of the courts.  As noted in *Napue v. Illinois,* "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment, [citations]. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264, 269 (1959)(citations omitted).

In 1974 the Ninth Circuit extended the reasoning of *Napue* to the presentation of false evidence to the grand jury and held that, the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached. *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974); see also *United States v. Thompson*, 576 F2d 874, 786 (9th Cir. 1978); *United States v. Kennedy*, 564 F2d 1329, 1338 (9th Cir. 1977) cert. den., 435 U.S. 944 (1978); *United States v. Ciambrone,* 601 F.2d 616,623 (2d Cir. 1979).

In *Basurto*, a co-conspirator turned informant testified falsely as to defendant's participation in a scheme to import marijuana prior to 1971. This testimony was material, since there was no other witness who testified before the grand jury as to the defendant's participation. Upon learning of the witness's perjured testimony, the prosecutor immediately informed defense counsel, but not the grand jury or the court. The prosecutor did refer to the fact that some of the witness's testimony was false in his opening statement at trial. See *Id*.

Recognizing that modern grand juries rely almost entirely on prosecutors to present and filter the evidence the grand juries review, the Ninth Circuit found that prosecutors were bound, under the Due Process Clause, to act in good faith before the grand jury.  Indeed, the Court held that "[w]henever the prosecutor learns of any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel -- and, if the perjury may be material, also the grand jury -- in order that appropriate action may be taken." *Basurto*, 497 U.S. at 785-86.

Similarly, the government cannot deprive a grand jury of the opportunity to evaluate the credibility of a witness. *United States v. Al Mudarris*, 695 F.2d 1182,1187-88 (9th Cir. 1983). In *United States v. Sager*, 227 F.3d 1138 (9 th Cir. 2000), the Ninth Circuit addressed a

motion to dismiss based on an allegation that a police officer had provided false grand jury testimony concerning the identification of the defendant as a man who used a stolen credit card in the store. Id. at 1142-43. In assessing the defendant's *Basurto* motion, the Ninth Circuit found that the officer's testimony "varied significantly over time in its description of [the store clerk]'s identification of [the defendant]," and that the false description of the identification was apparently "material" to the grand jury's determination. *Sager*, 227 F.3d at 1143. However, the court declined to reverse the denial of the motion to dismiss based on its finding that the officer's erroneous description of the identification was a mistake, not an intentional falsehood. *Id.*

Here, it is difficult to imagine that a properly informed Grand Jury would have indicted Mr. Franco, the young man who warned Mario Molina of the threat to his life in time for him to take steps to protect himself and his family from impending harm, who risked his life everyday to feed information to the government about the activities of the gang, and who even when under threat of death went back into the organization to gather intelligence for the FBI and SFPD.  (See Exhibit A – Molina Testimony 11/05/2010 Declaration of Geri Lynn Green in Support of Motions to Dismiss)

The Government has time and time again in attempts to paint Mr. Franco as a violent man, has maintained that the individual arrested on December 01, 2006 for armed robbery was the defendant.[1]   It was probable that the Government made the same misrepresentations to the Grand Jury that it did to the Court and Counsel knowing that Mr. Franco was not and could be the man arrested for the crime of robbery, because the defendant was busy meeting with the FBI more than 50 times during the very 8 same months Manuel "Samuel" Jose Franco was in jail.

Whatever law enforcement agent testified concerning Mr. Franco at the Grand Jury was

---

[1] Government discovery A1498-1510 is a police report describing the arrest on December 01, 2006 of an individual charged with robbery with a knife. (Exhibit K, Supplemental Declaration of Geri Lynn Green filed under seal).  This report evidences that this arrestee, though he shares a first and last name with the Defendant, has a different birth date than the Defendant. Furthermore, the individual arrested on December 01, 2006 under Incident Report 061277224 Green) was in the custody of the San Francisco Sheriff's Department from the arrest date until at least December 2007, a time period that the Defendant in this case was meeting with his FBI handlers on more than 50 occasions. (Exhibit L, Supplemental Declaration of Geri Lynn Green filed under seal.)

engaging in perjurious testimony if he or she did not disclose the fact that while Mr. Franco was engaging in the overt acts for which he has been indicted that he was acting as an agent on behalf of the Government.  Indeed, while allegedly committing the April 8, 2006 overt act, he was wearing a body-wire for the FBI (See Exhibit J).  It is difficult to imagine that a properly informed Grand Jury would have indicted him for that. It is equally unlikely that they were apprised of the fact that he joined up with SFPD and began infiltrating the organization within a week of the first two overt acts.  As it is that they were told that he was authorized to engage in these conspiratorial acts.

Dismissal of the indictment is appropriate when a witness' alleged perjury is material to the defendant's indictment. See *United States v. Spillone* 879 F.2d 514,524 (9th Cir. 1989), cert. denied, 111 S. Ct. 210 (1990); see also *United States v. Evans*, 928 F.2d 858,861 (9th Cir. 1991) ("perjured testimony must be material to support dismissal."). Thus, if sufficient non-perjurious testimony exists to support the indictment, the courts will not dismiss the indictment due to the presence of perjured testimony." *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985), cert. denied, 475 U.S. 1120 (1986). Stated simply, the Court must assess whether the grand jury would have indicted without having been exposed to the perjured testimony.

To date, there has been no evidence to support the indictment produced by the Government.  Without hoodwinking the Grand Jury, there was no evidence to support the indictment.

### III.   MR. FRANCO IS ENTITLED TO DISCLOSURE OF EVIDENCE OF PROSECUTORIAL MISCONDUCT BEFORE THE GRAND JURY IN TIME TO UTILIZE SUCH EVIDENCE IN A MOTION TO DISMISS.

Disclosure of information that could be used to exculpate the defendant or assist him in preparing his defense must be timed to enable the defendant to make effective use of the information. See *United States v. Bagley,* 473 U.S. 667 (1985); *United States v. Davenport*, 753 F.2d 1460 (9th Cir. 1985); *Scurr v. Niccum*, 620 F.2d 185, 191 & fn.3 (8th Cir.) 1980); *United States v. Baxter*, 492 F.2d 150, 1783-174 (9th Cir. 1973), cert. denied, 417 U.S. 940 (1974). As pointed out by the D.C. Circuit, "[d]isclosure by the government must be made at such time as to allow the defense to use the favorable material effectively in preparation and presentation of its

case, even if satisfaction of this criterion requires pretrial disclosure." *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976), cert. denied, 429 U.S. 924 (1976). The Ninth Circuit has confirmed that all Brady disclosures "must be made at a time when disclosure would still be of value to the accused." *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988); see also Davenport, 753 F.2d at 1462; *United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978), cert. denied, 442 U.S. 909 (1979)(delay in disclosure of Brady material requires reversal where disclosure is too late for the defendant to adequately prepare).

The Ninth Circuit has explicitly held that the government's disclosure of Brady materials must be made in time to allow the defendant the opportunity to prepare and present a motion to suppress if that motion may determine the outcome of the case. *United States v. Barton*, 995 F .2d 931, 935 (9th Cir. 1993) ("We hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); *United States v. Fernandez*, 231 F.3d 1240, 1248 n.5 (9th Cir. 2000) ("Nonetheless, the due process principles announced in *Brady* and its progeny must be applied to certain pretrial proceedings, such as suppression hearings."); *United States v. Tham*, 884 F.2d 1262, 1266 (9th Cir. 1989). Other Circuits have reached a similar conclusion. See *Smith v. Black*, 904 F.2d 950,965-66 (5th Cir. 1990), vacated on other grounds, 503 U.S. 930 (1992); *United States v. Veras,* 51 F.3d 1365, 1374 (7th Cir. 1995)(noting that Brady discovery is material if such discovery could have "affected the outcome of the suppression hearing", and thereby the case.); *Indelicato v. United States*, 106 F. Supp. 2d 151, 159, (2000) U.S. Dist., LEXIS 10516 (D.Mass. July 19, 2000)(discussing standard for habeas relief on allegation that government suppressed *Brady* material relevant to defendant's motion to suppress wiretap evidence.)

## CONCLUSION

This is a textbook example of a most egregious case of outrageous government misconduct. The defendant, a young man with no criminal background desirous of a career in law enforcement was induced, directed and financed by various law enforcement agencies to embed himself as a gang member over an extended period of time into what the government believed to be a giant gang conspiracy with the concomitant known risk to himself and family,

and no safe exit plan or strategy. He fully complied, wearing wires, engaging in directed activities and provided law enforcement agencies extensive information. As a result of his service, he and his family are facing death threats and he is being criminally charged for agreeing to the government's directions.  This case should be dismissed forthwith.


DATED: January 21, 2011                         Respectfully Submitted,

                                                LAW OFFICES OF GERI LYNN GREEN LC


                                                S/_____
                                                By: GERI LYNN GREEN
                                                Attorney for Defendant MANUEL FRANCO

1

## **TABLE OF AUTHORITIES**

2

## **Cases**

3

*Green v. United States*, 454 F.2d 783 (9th Cir. 1981),...........................................8

4

5

*Greene v. United States*, 454 F.2d 783 (9th Cir. 1971), ..........................................7

6

*Indelicato v. United States*, 106 F. Supp. 2d 151, 159, (2000) ...........................14

7

*Napue v. Illinois,* 360 U.S. 264, 269 (1959).........................................................10

8

*Scurr v. Niccum*, 620 F.2d 185, 191 & fn.3 (8th Cir.) 1980) ...........................13

9

*Smith v. Black*, 904 F.2d 950,965-66 (5th Cir. 1990)..........................................14

10

*United States v. Al Mudarris*, 695 F.2d 1182,1187-88 (9th Cir. 1983)............11

11

*United States v. Bagley*, 473 U.S. 667 (1985);.....................................................13

12

*United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991),...........8

13

*United States v. Barton*, 995 F .2d 931, 935 (9th Cir. 1993)...............................14

14

*United States v. Basurto,* 497 F.2d 781, 785 (9th Cir. 1974);............................10

15

*United States v. Ciambrone,* 601 F.2d 616,623 (2d Cir. 1979)..........................10

16

*United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985) ........................12

17

*United States v. Davenport*, 753 F.2d 1460 (9th Cir. 1985)...............................13

18

*United States v. Emmert*, 829 F.2d 805, 811 (9th Cir. 1987) ...............................6

19

*United States v. Evans*, 928 F.2d 858,861 (9th Cir. 1991) ................................12

20

*United States v. Fernandez*, 231 F.3d 1240, 1248 n.5 (9th Cir. 2000)...............14

21

*United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) .........................13

22

23

*United States v. Kennedy*, 564 F2d 1329, 1338 (9th Cir. 1977)..........................10

24

*United States v. Larrazolo,* 869 F.2d 1354, 1357-58 (9th Cir. 1989....................9

25

*United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir. 1989)................................6

26

*United States v. Mechanik,* 475 U.S. 66, 74 (1986)). .......................................10

27

*United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976) ..........................13

28

*United States v. Russell*, 411 U.S. 423 (1973)........................................................................ 6

*United States v. Sager*, 227 F.3d 1138 (9 th Cir. 2000), ...................................................... 11

*United States v. Shelton*, 588 F.2d 1242, 1247 (9th Cir. 1978)........................................... 14

*United States v. Simpson,* 813 F.2d at 1465 ......................................................................... 6

*United States v. Spillone* 879 F.2d 514,524 (9th Cir. 1989),................................................ 12

*United States v. Tham*, 884 F.2d 1262, 1266 (9th Cir. 1989)............................................... 14

*United States v. Veras,* 51 F.3d 1365, 1374 (7th Cir. 1995) ............................................... 14

*United States v. Williams*, 504 U.S. 36, 51-53 (1992) .......................................................... 9

*United States v. Williams*, 791 F.2d 1383, 1386 (9th Cir. 1986), ........................................ 6

1

<u>**TABLE OF CONTENTS**</u>

2

3      **STATEMENT OF FACTS**…………………………………………………………**02**

4      **PROCEDURAL HISTORY RELATED TO THE INDICTMENT**………………………**05**

5

6      **ARGUMENT**………………………………………………………………………**..06**

7          **I.     OUTRAGEOUS GOVERNMENT CONDUCT VIOLATES THE DUE
8                  PROCESS CLAUSE AND REQUIRES DISMISSAL OF AN INDICTMENT..06**

9          **II.    UPON A SHOWING THE GOVERNMENT COMMITTED MATERIALLY
10                 PREJUDICIAL MISCONDUCT BEFORE THE GRAND JURY, MR. FLORES
                   WOULD BE ENTITLED TO A DISMISSAL OF THE
11                 INDICTMENT…………..08**

12         **III.   MR. FRANCO IS ENTITLED TO DISCLOSURE OF EVIDENCE OF
                   PROSECUTORIAL MISCONDUCT BEFORE THE GRAND JURY IN TIME
13                 TO UTILIZE SUCH EVIDENCE IN A MOTION TO
                   DISMISS………………………………12**

14

15     **CONCLUSION**………………………………………………………………………**13**

16

17

18

19

20

21

22

23

24

25

26

27

28