GERI LYNN GREEN (SBN 127709)
Law Offices of Geri Lynn Green, LC
155 Montgomery Street, Suite 901
San Francisco, CA 94104
Tel: (415) 982-2600
Fax: (415) 358-4562
greenlaw700@gmail.com

Attorney for Defendant
MANUEL FRANCO

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>MANUEL FRANCO,<br><br>        Defendant. | Case. No. CR 08-0730 WHA<br><br>**DEFENDANT MANUEL FRANCO'S OPPOSITION TO GOVERNMENT'S MOTION TO QUASH RULE 17(c) SUBPOENA**<br><br>Date:  December 19, 2011<br>Time:  12:30 p.m.<br>Dept:  Hon. William Alsup |

### I.    INTRODUCTION

Defendant Manuel Franco respectfully opposes the Government's motion to quash the Federal Rule of Criminal Procedure 17(c) subpoena issued by this Court on November 21, 2011 and served upon the FBI.  As explained below, the subpoena is not "improper as a matter of law," does not seek information already provided to Mr. Franco through discovery, is not vague or overbroad, and seeks only relevant information.

### II.    ARGUMENT

#### A.    The Subpoena is Not Improper as a Matter of Law

The Government contends that the subpoena should be quashed because it "is improper as a matter of law." See Government's Motion to Quash Rule 17(c) Subpoena ("Motion to Quash") (Dckt. No. 5558) at 6.  As sole support for this position, the Government asserts, without explanation, that Mr. Franco is merely "seeking discovery and fishing from Brady . . . ." Id.  In fact, as the Court is well aware, for each of the eight categories of documents sought, Mr. Franco provided a detailed and particularized showing as to each of the United States v. Nixon 418 U.S. 683 (1974), factors and

demonstrated relevancy, admissibility, and specificity.  <u>See</u> Defendant Manuel Franco's Ex Parte Application, Memorandum of Points and Authorities, and Declaration of Counsel in Support of Order Authorizing Indigent Subpoena to Federal Bureau of Investigation Under Rule 17(b) and (c), Federal Rules of Criminal Procedure, and [Proposed] Order ("Ex Parte Application").

The language of the subpoena is actually drawn directly from the Attorney General's Guidelines Regarding the Use of Confidential Informants ("AG Informant Guidelines") and the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources ("AG Human Source Guidelines"). <u>See</u> Ex Parte Application, Exhibits A and B.  The FBI was mandated to create all of the documents sought through this subpoena, with the exception of several instances where Mr. Franco made a particularized showing that the documents must have been created in the ordinary course of the FBI's business in order for the FBI to be in compliance with the AG Informant Guidelines and/or the AG Human Source Guidelines.

It is unclear whether the Government is arguing that the subpoena is "improper as a matter of law" because the documents sought should have been obtained through discovery.  If that is its position, Mr. Franco established through his Ex Parte Application that the documents "are not otherwise procurable reasonably in advance of trial by exercise of due diligence" by demonstrating that he requested them on multiple occasions, but that the Government has thus far refused to produce them.  As the Court no doubt recalls, Mr. Franco attached to his Ex Parte Application the correspondence between defense counsel and the Government seeking the production of these documents, going back to March of 2009.  <u>See</u> Ex Parte Application, Exhibit J.  Mr. Franco's targeted requests for relevant and admissible documents that he knows to exist cannot be quashed merely because the Government has refused to produce them through discovery.

**B.     The Subpoena Does Not Seek Information Already Provided to Mr. Franco**

The Government contends that the subpoena should be quashed because it seeks information that has already been provided to Mr. Franco.  While the Government correctly notes that it has produced *other* records related to Mr. Franco's work as an informant—specifically, the FBI 302 reports documenting his debriefings, the consensual recordings he made for the FBI, and the Otherwise Illegal Activities authorization forms he signed—none of these documents were sought by Mr. Franco through this subpoena, and they would not be covered under the eight particularized requests.

As the Court is aware, none of the discovery produced by the Government thus far is responsive to the first, second, fourth, and fifth categories of documents included in the subpoena. The only arguably responsive document produced thus far to Mr. Franco's third request was the first February 5, 2010 letter from the FBI to Assistant U.S. Attorney ("AUSA") Christine Wong, summarizing the total amount paid to Mr. Franco, which did not include any information regarding when any payments were made or for what services and/or information he was paid, which is directly relevant to disproving the Government's allegations that Mr. Franco agreed to participate in the charged conspiracies and to prove that Mr. Franco was acting with public authority. Likewise, the only arguably responsive document produced thus far to Mr. Franco's sixth and seventh requests was the second February 5, 2010 letter from the FBI to AUSA Wong, explaining the circumstances regarding Mr. Franco's closure as a Confidential Human Source. This letter is only responsive to Mr. Franco's seventh request to the extent that it confirms that FBI Agent Sandra Flores had been assigned to Iraq by October 30, 2007, and does not even identify the date when Mr. Franco was closed or the FBI agent(s) who allegedly attempted to contact him. Of course, the contemporaneous documentation of these critical events—as opposed to a letter written years later—is directly relevant to Mr. Franco's defense.

Further, while the Government advises that the FBI does not possess the SFPD informant files relating to Mr. Franco that are sough through the eight request, when Mr. Franco attempted to subpoena these documents directly from the San Francisco Police Department ("SFPD"), Attorney Ronnie M. Wagner declared that the "FBI has any and all SFPD records relating to Franco's work with the SFPD." See Ex Parte Application, Exhibit H. The Government states that defense counsel "insists that the SFPD maintained copious, detailed records relating to the defendant as its informant and then sent the original records to the FBI without keep [sic] a copy for itself. This claim is wrong; indeed, it makes no sense even on an intuitive level." Motion to Quash, at 7 n.3. Mr. Franco agrees with the Government that it "makes no sense" that the SFPD would have sent its original records to the FBI without keeping a copy, but that is the position taken by the SFPD.

In response to Mr. Franco's subpoena seeking documents that the SFPD was required to create by its own Informant Management Manual, the SFPD produced only an informant initiation memorandum, an initiation form signed by Mr. Franco, one payment receipt, and a memorandum dated January 4, 2011 requesting Mr. Franco's deactivation, and asserted that any other SFPD records relating to Mr. Franco's

work had been provided to the FBI.  See Ex Parte Application, Exhibit H.  Thus, the issue is not that defense counsel "insists that the SFPD maintained copious, detailed records," but rather, ascertaining the location of the documents that the SFPD was required to create by the SFPD Informant Management Manual.  If these documents—including the establishment report outlining what could be expected from an informant, copies of all Source Debriefing Reports, copies of administrative correspondence concerning the informant, and, given the Government's position that Mr. Franco was deactivated prior to January 4, 2011, a contemporaneous deactivation report, see Ex Parte Application, Exhibit I—were not provided to the FBI, it appears that they were either lost or destroyed, unless the SFPD violated the Informant Management Manual and failed to create them in the first place.  What happened to the documents would certainly be relevant and admissible at Mr. Franco's trial, and if it turns out that records were lost or destroyed, a curative instruction may be required.

### C. The Subpoena Targets Relevant and Admissible Information with Specificity

The Government also claims that the subpoena is vague and overbroad and seeks irrelevant information.  Again, as the Court is aware, for each of the eight categories of documents sought, Mr. Franco provided a detailed and particularized showing as to each of the Nixon factors and demonstrated relevancy, admissibility, and specificity.  See Ex Parte Application.  The Government apparently makes this claim broadly, but only identifies three portions of the subpoena that it objects to with specificity.  Mr. Franco will address each in turn.

First, the Government claims that Mr. Franco's third request, seeking documents evidencing the payments made to him by the FBI, seeks irrelevant information because it "would call for the FBI's internal reimbursement forms" and for "receipts submitted for investigative expenses . . . ."  Motion to Quash, at 7.  However, as Mr. Franco explained in his Ex Parte Application, the documents that the FBI was required to create that evidence payments made to him by the FBI are relevant both to disprove the Government's allegations that Mr. Franco was a member of the charged conspiracies and to prove his likely public authority defense, as they establish that he was paid by the FBI to infiltrate the 20th Street Clique during the time period when he allegedly shared a common purpose with the gang.  Thus far, the Government has only produced a letter summarizing the total amount paid to Mr. Franco, without indicating when and for what information or services payments were made to him.  Given the dispute over what conduct of Mr. Franco's was authorized by the FBI, records of the individual payments made

to him are clearly relevant. At a minimum, documents showing that Mr. Franco was paid for providing information or services to the FBI on a certain date will prove that he was acting with public authority with respect for the conduct for which he was paid, but the requested documents will also establish more broadly the extent of Mr. Franco's work for the FBI and are probative of his state of mind, i.e., whether he agreed to the join the charged conspiracies.[1]

Second, the Government claims that Mr. Franco's sixth request, seeking production of documents relating to the replacement of his handler, FBI Special Agent Sandra Flores, when she was temporarily assigned to Iraq, "is so far afield of anything probative that is a complete frolic." Motion to Quash, at 7. Yet as the Court is well aware, what happened around the time that Agent Flores was temporarily assigned to Iraq is a critical and disputed issue in this case. Mr. Franco's sixth request seeks documents that will show what steps, if any, were taken to inform Mr. Franco that Agent Flores had been assigned to Iraq and/or to introduce him to his new handler; if the documents show that Mr. Franco was not so informed, they would tend to show that he lost contact with the FBI through no fault of his own, and not because he had joined the charged conspiracies. Mr. Franco does not seek information regarding the purpose of Agent Flores's assignment to Iraq, but the time frame of (a) when she was assigned to Iraq and (b) when she actually left the San Francisco Bay Area is highly relevant to determine how the FBI lost contact with Franco. In her testimony at the April 2011 trial, Agent Flores was unable recall exactly when she was transferred to Iraq—she testified it was around late September 2007—and the only documentation produced thus far is the February 5, 2010 letter to AUSA Wong referenced above, which merely documented that as of October 30, 2007, Agent Flores was already in Iraq.

Third, while the Government contended that "the demand for any and all documents that '*might* materially alter a prior suitability determination*'* is both vague and overbroad," Motion to Quash, at 7 (emphasis in original), that language is drawn directly from the two AG Guidelines. The AG Informant Guidelines, in effect from 2002 through approximately July 2007, mandated that the FBI "shall establish systems to ensure that all available information that might materially alter a prior suitability determination, including, but not limited to, information pertaining to unauthorized illegal activity by the

---

[1] While the Government did not claim that any of the forms sought were privileged, it could conceivably make redactions of privileged portions of documents if it can make such a showing. Of course, this would not be an argument related to the relevance of the records sought.

CI, is promptly reported to a Field Manger and then recorded and maintained in the CI's file." Ex Parte Application, Exhibit A, at II.A.2.b. Similarly, the AG Human Source Guidelines, which went into effect around July 2007, mandated that the FBI "shall establish procedures to ensure that all available information that might materially alter a prior validation assessment, including, but not limited to, information pertaining to unauthorized illegal activity by the Confidential Human Source, is promptly reported to an FBI Supervisor and then recorded and maintained in the file of the Confidential Human Source." Ex Parte Application, Exhibit B, at II.C.2.

The relevance of these documents to disprove the government's allegations that Mr. Franco was a member of the charged conspiracies and to prove his likely public authority defense should be readily apparent. Specifically, they will show whether the FBI received any information calling into question Mr. Franco's continuing suitability as an informant, and that Mr. Franco was not closed or deactivated as a result, which tends to show that he was acting with public authorization and not in furtherance of any of the charged conspiracies. Further, if there are no existing documents responsive to this request, this would be relevant to disprove the government's allegations against Mr. Franco by demonstrating that the FBI never received any information giving them reason to suspect that he had ever engaged in any unauthorized activities.

More generally, the Government's accusation that Mr. Franco "is merely engaging in a fishing expedition for speculative discovery relating to his criminal and/or civil case" is baseless. Motion to Quash, at 8. Mr. Franco made a specific and particularized showing as to each of the Nixon factors with respect to each and every category of documents sought through this subpoena. Each request identifies with specificity relevant and admissible documents that Mr. Franco knows to exist. In each case, Mr. Franco has repeatedly requested the documents from the Government, which has thus far failed to produce them. Further, because the documents sought are highly relevant to Mr. Franco's defense and would be admissible to establish his innocence, inspection in advance of trial is necessary to properly prepare for the examination of likely witnesses, and failure to obtain such inspection may tend to unreasonably delay the trial. As this Court has already found in issuing this subpoena, the requests are made in good faith, and are not intended as a general fishing expedition. Nothing in the Government's motion to quash indicates otherwise.

///

### III. CONCLUSION

For the foregoing reasons, Mr. Franco requests that the Court deny the Government's motion to quash the subpoena issued by this Court on November 21, 2011 and served upon the FBI.

                                            Respectfully submitted,

DATED: December 19, 2011

                              LAW OFFICES OF GERI LYNN GREEN, LC

                              By:_____/s/_____
                                  GERI LYNN GREEN
                                  Attorney for Defendant
                                  MANUEL FRANCO